## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| ANGELA STRICKLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CV1179 LMB |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Angela Stricklan for Supplemental Security Income under Title XVI of the Social Security Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint.  (Doc. No. 14).  Defendant filed a Brief in Support of the Answer.  (Doc. No. 19).

## Procedural History

On September 30, 2008, plaintiff filed an application for Supplemental Security Income, claiming that she became unable to work due to her disabling condition on May 25, 2007.  (Tr. 235-37).  This claim was denied initially and, following an administrative hearing, plaintiff's claim

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 8, 2011. (Tr. 148-52, 5-42).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on May 16, 2012.  (Tr. 4, 1-3).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

A.    **First ALJ Hearing**

Plaintiff's first administrative hearing was held on April 8, 2010.  (Tr. 53).  Plaintiff was present and was represented by counsel.  (Id.).  Also present was vocational expert Vincent Stock.  (Id.).

The ALJ examined plaintiff, who testified that she was thirty-three years of age.  (Tr. 56). Plaintiff stated that she was five-feet, six-inches tall and weighed 210 pounds.  (Id.).  Plaintiff testified that she was single, and had two children who were aged eleven and nine.  (Id.).  Plaintiff stated that her children live with her in the upstairs unit of a two-family flat.  (Id.). Plaintiff testified that her stepfather drove her to the hearing.  (Tr. 57).  Plaintiff stated that she has a valid Missouri driver's license and that she drives.  (Id.).  Plaintiff testified that she owns a car and she drives about ten miles a week.  (Id.).

Plaintiff stated that her daughter receives SSI benefits in the amount of $674.00 a month for a mental disability.  (Id.).  Plaintiff testified that her daughter has bipolar disorder and a "mental deficiency."  (Id.).  Plaintiff stated that she receives food stamps, Section 8 housing, and Medicaid.  (Tr. 58).

Plaintiff testified that she completed twelfth grade and that she took all special education

classes.  (Id.).  Plaintiff stated that she did not attend college or receive any vocational training.  (Tr. 59).  Plaintiff testified that she is able to read and write.  (Id.).

Plaintiff stated that she last worked on May 25, 2007.  (Id.).  Plaintiff testified that she worked for Globe Variety, and that the store closed on May 25, 2007.  (Id.).  Plaintiff stated that, if the store had not closed, she would "probably" still be working there at the time of the hearing.  (Tr. 60).  Plaintiff testified that she has applied for positions at factories since her job ended.  (Id.).

Plaintiff stated that she worked at a book binding factory for one to two months.  (Id.).  Plaintiff testified that she sat at a table and placed cardboard and plastic on a table, and a machine bound the books.  (Id.).

Plaintiff testified that she worked as a laundry aide for two-and-a-half months.  (Tr. 61).  Plaintiff stated that she was fired from this position because she was unable to get to work due to transportation problems.  (Id.).

Plaintiff testified that she worked as a floater and cashier at Globe Variety for fourteen months.  (Tr. 61-62).

Plaintiff stated that she became disabled on May 25, 2007, because she took special education classes in school, repeated the third grade, had difficulty with reading and math, and does not like to be around a lot of people.  (Tr. 62-63).

Plaintiff testified that she had an argument with her boss at Globe Variety on one occasion, when she was not able to catch a person who stole merchandise.  (Tr. 63).  Plaintiff stated that she left after the argument with her boss.  (Id.).  Plaintiff testified that she never had any problem getting along with her co-workers.  (Id.).

- 3 -

Plaintiff stated that she typically wakes up around 7:30 a.m., gets her kids ready for school, gives her kids their medication, walks the kids to the bus stop, and then cleans her house. (Id.).  Plaintiff testified that the bus stop is one block from her home.  (Tr. 64).  Plaintiff stated that she helps her daughter dress because her daughter has a mental deficiency.  (Id.).  Plaintiff testified that her children prepare their own breakfast.  (Id.).  Plaintiff stated that she cooks, does laundry, washes dishes, makes beds, mops, and sweeps.  (Id.).  Plaintiff testified that she shops for groceries, and that she does not talk to anybody in the store.  (Tr. 65).  Plaintiff stated that she watches television in the afternoon before her kids get home from school.  (Id.).  Plaintiff testified that she reads when she has time, and that she enjoys reading Stephen King novels.  (Tr. 66). Plaintiff stated that it usually takes her about one week to read a novel.  (Id.).

Plaintiff testified that she does not have any friends, but she has a boyfriend.  (Id.). Plaintiff testified that she gets along with her mother and her stepfather.  (Id.).  Plaintiff stated that she gets along well with her downstairs neighbor.  (Tr. 67).  Plaintiff testified that she is not active in any organizations or Church.  (Id.).  Plaintiff stated that she does not go out in the evening, and that she is more of a "home person."  (Id.).  Plaintiff testified that she takes her son to the park to play soccer.  (Id.).

Plaintiff stated that she smokes about half of a package of cigarettes a day.  (Tr. 68). Plaintiff testified that she does not drink or do drugs.  (Id.).

Plaintiff testified that she takes Depakote[2] for her mood swings.  (Tr. 69).  Plaintiff stated

---

[2]Depakote is indicated for the treatment of bipolar disorder.  See Physician's Desk Reference ("PDR"), 2088 (63rd Ed. 2009).

that the medication controls her mood swings.  (Id.).  Plaintiff testified that she takes Zoloft,[3]

which helps.  (Id.).  Plaintiff stated that she takes Xanax[4] for anxiety, and that it is effective.  (Tr.

70).  Plaintiff testified that she takes Trazodone[5] to help her sleep.  (Id.).

 Plaintiff testified that she has carpal tunnel syndrome.[6]  (Tr. 71).  Plaintiff stated that she is

able to use her hands to a certain extent but she is unable to hold anything heavy due to pain and

numbness in her fingers.  (Id.).  Plaintiff testified that she is able to button, zip, feed herself with

utensils, put on her shoes and socks, and comb her hair.  (Tr. 71-72).

 Plaintiff stated that she has sleep apnea[7] and restless leg syndrome,[8] but she receives no

treatment for these impairments.  (Tr. 72-73).

 Plaintiff testified that she experiences no side effects from her current medications.  (Tr.

73).

---

[3]Zoloft is an antidepressant drug indicated for the treatment of depression and other mood disorders.  See WebMD, http://www.webmd.com/drugs (last visited September 11, 2013).

[4]Xanax is indicated for the treatment of anxiety and panic disorders.  See WebMD, http://www.webmd.com/drugs (last visited September 11, 2013).

[5]Trazodone is an antidepressant drug indicated for the treatment of depression and other mood disorders.  See WebMD, http://www.webmd.com/drugs (last visited September 11, 2013).

[6]The most common nerve entrapment syndrome, characterized by paresthesias, typically nocturnal, and sometimes sensory loss and wasting in the median nerve distribution in the hand. Stedman's Medical Dictionary, 1892 (28th Ed. 2006).

[7]A disorder characterized by recurrent interruptions of breathing during sleep due to temporary obstruction of the airway.  See Stedman's at 119.

[8]A sense of indescribable uneasiness, twitching, or restlessness that occurs in the legs after going to bed, frequently leading to insomnia, which may be relieved temporarily by walking about. Stedman's at 1911.

Plaintiff stated that she experiences depression, and that she cries often.  (Tr. 73-74).

Plaintiff testified that she last experienced a crying spell about one week prior to the hearing.  (Tr. 74).

Plaintiff stated that she has not had an anxiety attack within the last month.  (Id.).  Plaintiff testified that she experienced a panic attack on one occasion.  (Id.).

Plaintiff stated that she has never been in a mental hospital.  (Id.).  Plaintiff testified that she is under the care of psychiatrist Dr. Manikant Desai.  (Id.).  Plaintiff stated that she sees Dr. Desai once a month.  (Id.).  Plaintiff testified that she only felt suicidal on one occasion, in 1998.  (Id.).

Plaintiff stated that she attempted suicide by taking 300 pills in 1998.  (Id.).  Plaintiff testified that she was hospitalized for a day-and-a-half after her suicide attempt, and she started receiving psychiatric care after she was discharged.  (Tr. 75).  Plaintiff stated that she saw psychiatrist Dr. Luzviminda Santos until she retired in 2007.  (Id.).

Plaintiff testified that she likes factory work, but some of the work is hard for her.  (Id.).  Plaintiff stated that she does not talk to many people and has some difficulty getting along with people.  (Tr. 76).  Plaintiff testified that she did not have a supervisor standing over her when she worked at the factory.  (Id.).  Plaintiff stated that she becomes distracted easily.  (Tr. 77).  Plaintiff testified that she needed one rest period in the morning and one in the afternoon.  (Id.).  Plaintiff stated that she is able to ask simple questions and request help.  (Id.).  Plaintiff testified that she is unable to interact with co-workers without distracting them.  (Id.).  Plaintiff stated that she is unable to deal with stress.  (Tr. 78).  Plaintiff testified that she is able to stay away from hazards in the workplace.  (Id.).  Plaintiff stated that she has difficulty interacting with people and

- 6 -

that she had an explosive fight with her boss.  (Id.).  Plaintiff testified that she has no difficulty with neatness and cleanliness, and that she cleans her house almost daily.  (Tr. 79).  Plaintiff stated that she is not good with directions when traveling.  (Id.).  Plaintiff testified that she is able to use public transportation.  (Id.).

Plaintiff stated that she has difficulty with concentration.  (Id.).  Plaintiff testified that she forgets where she left off when she reads, and has to re-read portions of books.  (Id.).

Plaintiff stated that she is moody all the time.  (Tr. 80).  Plaintiff testified that she is happy "most of the time," but experiences mood swings.  (Id.).  Plaintiff stated that she experiences manic episodes.  (Id.).

Plaintiff testified that she has no difficulty sitting down.  (Id.).  Plaintiff stated that she is able to stand for long periods, and is able to walk about four blocks.  (Id.).  Plaintiff testified that she is able to lift about twenty pounds.  (Tr. 81).  Plaintiff stated that she has difficulty kneeling due to back pain.  (Id.).  Plaintiff testified that she injured her back in a car accident when she was seventeen.  (Id.).  Plaintiff stated that she no longer experiences much back pain.  (Id.).  Plaintiff testified that she is able to climb stairs.  (Tr. 82).

Plaintiff's attorney next examined plaintiff, who testified that she has gained about forty pounds since she applied for benefits due to her medication.  (Id.).

Plaintiff stated that she does not receive child support because her children's father is unemployed and was recently released from prison for failing to pay child support.  (Tr. 83).

Plaintiff testified that she repeated the third grade.  (Id.).

Plaintiff stated that her mother helped her complete the paperwork for her application for benefits.  (Id.).  Plaintiff testified that she did not understand some of the questions on the

application.  (Id.).

Plaintiff stated that she did not have difficulty performing her factory job.  (Id.).

Plaintiff testified that her position at Globe Drug was not a full-time job.  (Id.).  Plaintiff
stated that she had no difficulty performing the cashier job.  (Tr. 84).  Plaintiff testified that the
other part of the position involved walking around all day, which was difficult because she was
unable to take breaks.  (Id.).

Plaintiff stated that she was tired at the time of the hearing from taking Xanax.  (Id.).
Plaintiff testified that she takes Xanax daily and drowsiness is a side effect of the medication.
(Id.).  Plaintiff stated that she takes a one-to-two-hour-long nap after taking her medication.
(Id.).  Plaintiff testified that the day prior to the hearing, she napped from 12:50 to 3:50.  (Tr. 85).

Plaintiff stated that she experiences crying spells approximately once every three months.
(Id.).  Plaintiff testified that her doctor recently added Lamictal[9] to help control her mood swings.
(Tr. 86).

Plaintiff stated that she has been getting along with her mother better the past year.  (Id.).
Plaintiff testified that she used to argue with her mother because her mother gave her unsolicited
advice.  (Id.).

The ALJ next examined vocational expert Vincent Scott, who testified that plaintiff's past
work is classified as follows: cashier (light, but performed by plaintiff as medium and light);
laundry (medium, performed by plaintiff as light); and machine operator (medium, performed by
plaintiff as light).

The ALJ asked Mr. Scott to assume a hypothetical individual with plaintiff's background

---

[9]Lamictal is indicated for the treatment of bipolar disorder.  See PDR at 1490-91.

and the following limitations: capable of performing light work; can occasionally kneel or crawl; limited to simple, repetitive tasks and instructions; and occasional interaction with supervisors, co-workers and the public. (Tr. 89). Mr. Scott testified that plaintiff's past positions of laundry aide and machine operator would be available as plaintiff performed them, but not as they are ordinarily performed in the national economy. (Id.). Mr. Scott stated that the individual could perform other light, unskilled jobs, such as housekeeping (400,000 positions nationally; 10,000 in Missouri); and masker semiconductor (120,000 positions nationally; 3,000 in Missouri). (Id.).

Plaintiff's attorney asked Mr. Scott to assume the limitations found by Dr. Desai. (Tr. 90). Mr. Scott testified that an individual with these limitations would not be employable. (Id.).

The ALJ indicated that he would order a psychological consultative examination due to conflicts between plaintiff's testimony and the opinion of plaintiff's doctor. (Tr. 91).

## B.  Second ALJ Hearing

Plaintiff's second administrative hearing was held on January 25, 2011. (Tr. 95). Plaintiff was present and was represented by counsel. (Id.). Also present was vocational expert Dr. Magrowski and medical expert Charles Arvenshine. (Id.).

The ALJ indicated that plaintiff had undergone a consultative psychiatric examination, and that he had scheduled a hearing with a medical expert due to questions raised in that consultation. (Tr. 96).

The ALJ examined Dr. Arvenshine, who testified that he had not examined plaintiff but he had reviewed her records and he had sufficient evidence to form an opinion regarding plaintiff's medical status. (Tr. 98-99). Dr. Arvenshine expressed the opinion that plaintiff does  not meet or equal the criteria of a listed impairment. (Tr. 104). With regard to the "B criteria," Dr.

Arvenshine testified that plaintiff has minor limitations in activities of daily living; plaintiff gets along with people and makes a good impression; she has moderate limitations in concentration and persistence; and has had no episodes of decompensation. (Tr. 105).

Plaintiff's attorney examined Dr. Arvenshine, who testified that his answer with regard to the B criteria would not change if he evaluated plaintiff's impairments in combination. (Tr. 106). Dr. Arvenshine testified that he has seen no evidence that plaintiff has difficulty getting along with supervisors, co-workers, or customers. (Id.).

Dr. Arvenshine stated that he did not believe Dr. Desai's opinion that plaintiff was unable to cope and would miss more than four days of work per month was supported by the evidence. (Tr. 107).

Dr. Arvenshine testified that, although he indicated he considered the opinions of Daniel Frye and Keith Dunn, he realized these individuals were not medical experts. (Id.). Dr. Arvenshine stated that his opinion was based on the preponderance of evidence, and that he gave more weight to the opinions of treating physicians, psychiatrists, and psychologists than to non-examining sources. (Tr. 107-09). Dr. Arvenshine testified that he discounted the opinion of Dr. Desai because there was too much overriding evidence in the record. (Tr. 109).

Dr. Arvenshine stated that he had no reason to believe the IQ scores assessed by Dr. Mades were inaccurate, but noted that they were old. (Id.). Dr. Arvenshine testified that an individual should ideally be tested every two to three years. (Tr. 110). Dr. Arvenshine stated that plaintiff's IQ has been fairly stable over the years. (Id.).

Dr. Arvenshine testified that plaintiff may need some assistance managing her benefits. (Tr. 111-12). Dr. Arvenshine stated that, while plaintiff would have occasional difficulty getting

along with people, he would not rule out the possibility of her holding a job.  (Tr. 112).

Dr. Arvenshine testified that plaintiff's dosage of Xanax could interfere with her functioning, but he would not assume that it does.  (Tr. 113).

Dr. Arvenshine stated that he was familiar with Listing 12.05.  (Id.).  Dr. Arvenshine testified that an IQ score of 68 would be within the listing, but he did not believe this score tells "the whole story."  (Tr. 114).  Dr. Arvenshine stated that plaintiff has another significant impairment in addition to her low IQ–an affective disorder and anxiety disorder.  (Tr. 115).

Plaintiff's attorney examined plaintiff, who testified that her medications help, but she still experiences mood swings and she blows up at people.  (Tr. 116).  Plaintiff stated that she experiences drowsiness from the Xanax, and that she sleeps after taking it.  (Id.).

Plaintiff testified that she worked for Globe Variety prior to applying for benefits.  (Tr. 117).  Plaintiff stated that she worked as a backup cashier and a floater at this position.  (Id.).  Plaintiff explained that a floater watches the customers to prevent them from stealing.  (Id.).

Plaintiff testified that she got into an argument with her supervisor because he did not believe her when she told him that a customer had stolen merchandise.  (Id.).  Plaintiff stated that she got along with some customers and did not get along with other customers.  (Id.).  Plaintiff testified that she encountered many alcoholic customers that caused problems.  (Tr. 118).

Plaintiff stated that she worked at this position part-time.  (Id.).  Plaintiff testified that she could not have worked full-time at the position because many of the customers irritated her.  (Id.).  Plaintiff stated that many customers were unable to pay for merchandise, which required plaintiff to void the purchases.  (Id.).  Plaintiff testified that she told the customer to leave if they caused her to void multiple transactions.  (Id.).  Plaintiff stated that she got in trouble when she

had multiple voids at her register.  (Id.).  Plaintiff testified that she worked as a back-up cashier,

relieving cashiers when they took breaks.  (Tr. 119).  Plaintiff stated that she stopped working at

this position because the business closed two years prior to the hearing.  (Id.).  Plaintiff testified

that she would not have worked at this position full-time if the business had not closed.  (Id.).

In a closing statement, plaintiff's attorney argued that plaintiff meets or equals the listing

for mental retardation because she has a valid IQ score of 68, and an additional significant

impairment according to the testimony of the medical expert.  (Tr. 120).

C.   **Relevant Medical Records**

Plaintiff presented to psychologist Gitry Heydebrand, Ph.D., on January 31, 2003, for a

psychological evaluation.  (Tr. 854-58).  Plaintiff complained of depression, difficulty

concentrating on the job, and learning problems.  (Tr. 854).  Dr. Heydebrand administered

intellectual testing, which revealed a Verbal IQ of 75, Performance IQ of 72, and Full Scale IQ of

71.  (Tr. 856).  Dr. Heydebrand stated that plaintiff's scores appeared to be valid and placed her

in the borderline range of intellectual ability.  (Id.).  Dr. Heydebrand diagnosed plaintiff with

major depression, mild; borderline IQ; and a GAF score of 80.[10]  (Tr. 857).  Dr. Heydebrand

stated that, based on the test results, educational and work history, and quality of plaintiff's

responses, she is thought to meet criteria for borderline IQ.  (Id.).  Dr. Heydebrand found that

plaintiff displayed a basic capacity to understand and carry out simple instructions; was able to

concentrate and focus on tasks to complete them as required during the clinical interview; her

_____

[10]A GAF score of 71 to 80 denotes "[i]f symptoms are present, they are transient and
expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family
argument); no more than slight impairment in social, occupational, or school functioning (e.g.,
temporarily falling behind in schoolwork)."  Diagnostic and Statistical Manual of Mental
Disorders (DSM-IV), 32 (4th Ed. 1994).

level of social responsiveness was fair and her ability to adapt to environmental changes appeared to be limited; she was able to complete basic activities of daily living and perform household chores; and she was judged not competent to manage her own funds based on her cognitive status. (Tr. 857-58).

Plaintiff presented to psychologist L. Lynn Mades, Ph.D., for a psychological evaluation on September 20, 2007. (Tr. 420-25). Plaintiff complained of not being able to find a job. (Tr. 420). Plaintiff reported a history of learning disability. (Tr. 421). Plaintiff complained of mood problems for the past four to five years, depression occurring four to five days a week, and difficulty sleeping. (Id.). Upon mental status examination, plaintiff was cooperative and pleasant; coherent and logical; speech was normal; mood was euthymic; affect was full and generally appropriate; no thought disturbances, delusions, or hallucinations were noted; memory was within normal limits; and insight and judgment appeared to be slightly limited. (Tr. 422-23). Dr. Mades administered intellectual testing, which revealed a Verbal IQ of 68, Performance IQ of 83, and Full Scale IQ of 73. (Tr. 423). Plaintiff's IQ scores placed her in the borderline range of cognitive functioning overall. (Id.). Dr. Mades diagnosed plaintiff with depressive disorder NOS; borderline intellectual functioning; and a GAF score of 70-75.[11] (Tr. 424). Dr. Mades noted that there was a significant difference between plaintiff's verbal and performance scores, which indicated that her actual cognitive potential may be closer to the low average range, commensurate with her performance score. (Id.). Dr. Mades stated that no evidence of a thought

---

[11]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

disturbance was noted during the examination, and there was evidence of mild mood and

cognitive impairment by history and presentation.  (Id.).  Dr. Mades found that plaintiff appeared

competent to manage her own funds.  (Id.).

Plaintiff presented to Luzviminda R. Santos, M.D. on September 24, 2007, at which time

plaintiff reported she was overwhelmed by day-to-day stressors.  (Tr. 718).  Dr. Santos diagnosed

plaintiff with bipolar affective disorder,[12] borderline intellectual functioning, and a GAF score of

55.[13]  (Id.).  On December 10, 2007, plaintiff reported that she had been under stress lately and

that she was trying to obtain SSI benefits.  (Tr. 500).  Dr. Santos increased plaintiff's dosage of

Xanax.  (Id.).  On January 9, 2008, Dr. Santos diagnosed plaintiff with bipolar affective disorder,

borderline intellectual functioning, and a GAF score of 60.  (Tr. 713).  On March 19, 2008,

plaintiff reported that she was stressed out.  (Tr. 716).  Dr. Santos' diagnoses remained

unchanged.  (Id.).  On April 15, 2008, plaintiff complained of being stressed out because she lived

with her father and her two children and has no personal space.  (Tr. 714).  Dr. Santos assessed a

GAF score of 55.  (Id.).  On May 14, 2008, plaintiff reported that she had an interview at a

factory.  (Tr. 715).  Dr. Santos assessed a GAF score of 60.  (Id.).

Plaintiff saw Jordan Balter, D.O., on September 25, 2008, at which time it was noted that

plaintiff was taking her medication and was currently stable.  (Tr. 532).  Dr. Balter diagnosed

---

[12]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes.  Stedman's at 568.

[13]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

plaintiff with bipolar disorder-stable; and a GAF score of 50.[14]  (Id.).

Plaintiff presented to St. Alexius Hospital on November 4, 2009.  (Tr. 598).  Manikant Desai, M.D., diagnosed plaintiff with bipolar disorder I,[15] currently depressed, moderate.  (Id.).

Plaintiff presented to Dr. Desai on March 10, 2010, at which time she complained of depression and anger spells.  (Tr. 747).  Dr. Desai diagnosed plaintiff with bipolar affective disorder and generalized anxiety disorder.[16]  (Id.).  Dr. Desai added Lamictal.  (Id.).  On March 31, 2010, plaintiff continued to report depression and anger.  (Tr. 746).

Dr. Desai completed a Mental Residual Functional Capacity Questionnaire on March 31, 2010, in which he listed the following findings observed on previous examinations: mood swings, poor concentration, anxiety attacks, and pain in the hands from carpal tunnel syndrome.  (Tr. 739).  Dr. Desai indicated that plaintiff suffered from the following symptoms: mood disturbance, difficulty thinking or concentrating, bipolar syndrome, easy distractability, and sleep disturbance. (Tr. 740).  Dr. Desai expressed the opinion that plaintiff had no useful ability to function, or extreme limitations in the following abilities: perform at a consistent pace without an unreasonable number of length of rest periods; and accept instructions and respond appropriately to criticisms from supervisors.  (Tr. 741).  Plaintiff was unable to meet competitive standards in the following areas: remember work-like procedures, sustain an ordinary routine without special supervision,

---

[14]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

[15]An affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and major depressive episodes.  Stedman's at 568.

[16]A psychological disorder in which anxiety or morbid fear and dread accompanied by autonomic changes are prominent features.  Stedman's at 569.

make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, ask simple questions or request assistance, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal work stress and be aware of normal hazards and take appropriate precautions.  (Id.).  Dr. Desai found that plaintiff was seriously limited but not precluded in the following areas: carry out very short and simple instructions, maintain attention for two-hour segments, maintain regular attendance and be punctual within customer tolerances, sustain an ordinary routine without special supervision, and work in coordination with or proximity to others without being unduly distracted.  (Id.).  Dr. Desai found that plaintiff was limited but satisfactory in her ability to understand and remember very short and simple instructions and perform at a consistent pace without an unreasonable number and length of rest periods.  (Id.).  Dr. Desai indicated that plaintiff did not have a low IQ or reduced intellectual functioning.  (Tr. 742).  Dr. Desai found that plaintiff would be absent from work more than four days a month due to her impairments. (Tr. 743).  Finally, Dr. Desai indicated that plaintiff was unable to manage benefits in her own best interest.  (Id.).

Plaintiff saw Dr. Desai on April 28, 2010, at which time Dr. Desai increased her dosage of Lamictal.  (Tr. 903).

Plaintiff presented to psychologist Arthur C. Littleton, Ph.D., on June 9, 2010, for a psychological evaluation at the request of the state agency.  (Tr. 750-52).  Upon mental status examination, plaintiff appeared neat and was pleasant and compliant; plaintiff was devoid of any anxiety; no evidence of anger or hostility was observed; she reported that she enjoyed playing

with her children but had limited association with other people; there was no indication she is socially isolated or withdrawn; plaintiff reported blowing up easily and having difficulty controlling her temper; plaintiff did not report or evidence feelings of worthlessness, sadness, low self-esteem or poor concentration; she expressed her thoughts and ideas well; and there was no evidence she was confused by routine daily events. (Tr. 751). Dr. Littleton diagnosed plaintiff with bipolar II disorder,[17] and a GAF score of 55. (Tr. 752). Dr. Littleton stated that plaintiff describes adjustment problems associated with a fairly chronic pattern of unpredictable mood episodes that contribute to problems with interpersonal and employment functions. (Id.). Dr. Littleton indicated that plaintiff's symptoms are not consistent with clinical depression or psychosis. (Id.). Dr. Littleton stated that plaintiff "seems marginally competent enough to manage her own financial affairs." (Id.).

Dr. Littleton completed a Medical Source Statement of Ability to do Work-Related Activities (Mental), in which he expressed the opinion that plaintiff's ability to understand, remember, and carry out instructions was not affected by her impairment. (Tr. 753). Dr. Littleton found that plaintiff had a moderate limitation in her ability to respond appropriately to usual work situations and changes in a routine work setting; and mild limitations in her ability to interact appropriately with the public, interact appropriately with supervisors, and interact appropriately with co-workers. (Tr. 754). Dr. Littleton stated that plaintiff has symptoms of bi-polar disorder and responds poorly to stress. (Id.).

---

[17]An affective disorder characterized by the occurrence of alternating, hypomanic and major depressive episodes. Stedman's at 568.

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since September 30, 2008, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: borderline intellectual functioning, bipolar disorder, generalized anxiety disorder, intermittent explosive personality disorder, osteoarthritis in her upper extremities, and obesity (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that during the period at issue in this decision the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that the claimant is limited to only occasional kneeling or crawling; is limited to simple repetitive tasks and instructions; and is limited to only occasional interaction with supervisors, co-workers, and the public.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on May 15, 1976 and was 32 years old, which is defined as a younger individual age 18-49, on the date the application was protectively filed (20 CFR 416.963).

7.    The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since September 30, 2008, the date the application was protectively filed (20 CFR

- 18 -

416.920(g)).

(Tr. 11-36).

The ALJ's final decision reads as follows:

> Based on the application for supplemental security income protectively filed on September 30, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 36).

**Discussion**

**A.**      **Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.**     **Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See

- 20 -

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."  20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See

- 21 -

20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in failing to properly consider Listing 12.05C, the listing for mental retardation. Specifically, plaintiff contends that the ALJ erroneously considered Listing 12.02, the listing for organic mental disorders, when plaintiff met Listing 12.05C. Plaintiff next argues that the ALJ failed to fully and fairly develop the record. The undersigned will discuss plaintiff's claims in turn.

"The claimant has the burden of proving that his impairment meets or equals a listing," Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010); and, "'[t]o meet a listing, an impairment must meet all of the listing's specified criteria,'" id. (quoting Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004)).

Listing 12.05 provides as follows:

12.05 Mental Retardation: Mental retardation refers to significantly subaverage

- 22 -

general intellectual functioning with deficits in adaptive functioning initially
manifested during the developmental period; i.e., the evidence demonstrates or
supports onset of the impairment before age 22.
The required level of severity for this disorder is met when the requirements in A,
B, C, or D are satisfied.

&ast;&ast;&ast;

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a
physical
or other mental impairment imposing an additional and significant work-
related limitation of function;

20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05.

In addition, the overall introduction to the mental disorders section states:
Listing 12.05 contains an introductory paragraph with the diagnostic description for
mental retardation.  It also contains four sets of criteria (paragraphs A through D).  If your
impairment satisfies the diagnostic description in the introductory paragraph and any one
of the four sets of criteria, we will find that your impairment meets the listing.

Id. at § 12.00.

The Eighth Circuit has held that the requirements in the introductory paragraph of Listing

12.05-the diagnostic description of mental retardation-are mandatory.  Maresh v. Barnhart, 438

F.3d 897, 899 (8th Cir. 2006).  Thus, in order to qualify as mentally retarded under Listing

12.05C, plaintiff was required to show: (1) significantly subaverage general intellectual

functioning with deficits in adaptive functioning, (2) an onset of that impairment prior to age

twenty-two, (3) a valid IQ score between 60 and 70, and (4) an additional impairment imposing a

significant work-related limitation of function.  See Cheatum v. Astrue, 388 Fed. Appx. 574, 576

(8th Cir. 2010) (holding that a claimant must prove deficits in adaptive functioning in addition to

the elements of paragraph C); Maresh, 438 F.3d at 899.

As an initial matter, the undersigned notes that, despite plaintiff's claim to the contrary,

the ALJ did consider Listing 12.05.  (Tr. 26-29).  The ALJ also considered Listing 12.02 in his

exhaustive, seventeen-page analysis of the listings.  (Tr. 12-29).  The ALJ ultimately found that

plaintiff failed to meet the criteria for mental retardation because she did not have the requisite IQ

scores or deficits in adaptive functioning.  (Tr. 26-29).  The ALJ's determination is supported by

substantial evidence.

The ALJ acknowledged that plaintiff received special education services from 1985

through 1996 based on a diagnosis of "mentally retarded," and that plaintiff met the child-

equivalent 12.05C listing for mental retardation.  (Tr. 12).  On July 26, 1999, the Commissioner

evaluated plaintiff's application under the criteria for disabled adults, and determined that

plaintiff's disability had ceased as of November 15, 1998.  (Tr. 13, 131-37).  It was noted that

plaintiff had IQ scores ranging from 64 to 75, but the ALJ in the 1999 decision did not specifically

evaluate Listing 12.05C.  (Tr. 131-37).

Plaintiff notes that defendant previously found plaintiff met the IQ requirement of the child

listing, and that the ALJ did not dispute plaintiff's IQ scores in the 1999 decision.  Plaintiff

contends that defendant should be required to follow its own law-of-the-case and should be

estopped from now disputing plaintiff's IQ results.

"The law of the case doctrine prevents the relitigation of a settled issue in a case and

requires courts to adhere to decisions made in earlier proceedings..."  Brachtel v. Apfel, 132 F.3d

417, 419 (8th Cir. 1997).  However, the law of the case doctrine does not preclude a different

conclusion if the adjudicator is presented with substantially different evidence.  Hulsey v. Astrue,

622 F.3d 917, 925 (8th Cir. 2010).  In this case, the evidence considered by the ALJ was

substantially different from the evidence considered in plaintiff's child disability application and

- 24 -

the 1999 decision.  Thus, the law of the case doctrine does not apply.

The ALJ in the instant case considered plaintiff's IQ scores that were within the listing range, and found that these scores were not supported by the evidence.  The ALJ found that plaintiff was instead functioning within the borderline range of intellectual functioning.

While an I.Q. test is helpful in determining whether an applicant has a mental impairment, it is not dispositive, and other information illustrating the claimant's ability to function can be used to discredit the results of an I.Q. test.  Johnson v. Barnhart, 390 F.3d 1067, 1071 (8th Cir. 2004) (citing Holland v. Apfel, 153 F.3d 620, 622 (8th Cir. 1998)).  The Eighth Circuit has emphasized that I.Q. scores must be valid; that the Commissioner need not rely exclusively on I.Q. scores; and that the Commissioner may disregard test scores that are inconsistent with a claimant's demonstrated activities and abilities as reflected in the record as a whole.  Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998).  The appropriate question is whether the decision to disregard the scores as unreliable is supported by substantial evidence from the record as a whole.  See id.

The ALJ discussed plaintiff's most recent IQ scores based on testing administered by Dr. Mades in September 2007.  Plaintiff obtained a Verbal IQ of 68, Performance IQ of 83, and Full Scale IQ of 73.  The ALJ noted that, while plaintiff's Verbal IQ score is within listing range, Dr. Mades stated that there was a significant difference between plaintiff's verbal and performance scores, which indicated that her actual cognitive potential may be closer to the low average range, commensurate with her performance score of 83.  (Tr. 424).  Dr. Mades diagnosed plaintiff with borderline intellectual functioning.  (Id.).  The ALJ also pointed out that earlier testing administered by Dr. Heydebrand in January 2003, revealed a Verbal IQ of 75, Performance IQ of

72, and Full Scale IQ of 71.  (Tr. 856).  As the ALJ noted, Dr. Heydebrand diagnosed plaintiff

with borderline IQ, based on plaintiff's scores, educational and work history, and quality of her

responses.  (Tr. 857).  The ALJ stated that Drs. Mades and Heydebrand's diagnosis of borderline

intellectual functioning is consistent with the longstanding diagnosis of borderline intellectual

functioning as opined by plaintiff's treating psychiatrist Dr. Santos.  (Tr. 27).  Finally, the ALJ

noted that medical expert Dr. Arvenshine testified based on the record that plaintiff's true level of

functioning was borderline intellectual functioning.  The ALJ's finding that plaintiff's IQ scores

were not within the range of Listing 12.05C is supported by substantial evidence.

      The ALJ also cited evidence demonstrating that plaintiff did not exhibit the requisite

deficits in adaptive functioning required by Listing 12.05C.  For example, the ALJ noted that

plaintiff completed the twelfth grade; obtained a driver's license and regularly drives; is able to

read and write; takes care of two children, including one disabled child; cleans and performs

household chores daily; cooks; shops for groceries; gets along with her parents and boyfriend; and

reads novels.  (Tr. 24-25).  Significantly, the ALJ pointed out that plaintiff successfully worked as

a cashier at a drug store for over one year, testified that she would probably still be working there

if the business had not closed, and continued to look for other jobs.  (Tr. 24, 60).  While plaintiff

testified that she only worked part-time and would be unable to work full-time at this position, the

ALJ noted that plaintiff's earning record supports the finding that she worked full-time, as she

earned income at the substantial gainful activity level.  (Tr. 18).  Plaintiff's ability to perform

gainful activity is relevant to whether she has demonstrated the deficits in adaptive functioning

necessary to meet Listing 12.05C.  See Cheatum, 388 Fed. Appx. at 566-77.  Thus, the ALJ's

finding that plaintiff did not meet or equal Listing 12.05C is supported by substantial evidence.

After properly finding that plaintiff did not meet or equal a listing, the ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that during the period at issue in this decision the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that the claimant is limited to only occasional kneeling or crawling; is limited to simple repetitive tasks and instructions; and is limited to only occasional interaction with supervisors, co-workers, and the public.

(Tr. 29).

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545. While the formulation of RFC is a medical question, Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000), it is based on all the relevant, credible evidence of record including the medical records, observations of treating physicians and others, and an individual's own description of limitations. See McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003).

Plaintiff does not challenge the ALJ's RFC determination directly, but argues that the ALJ failed to fully and fairly develop the record regarding plaintiff's mental impairments. "'Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.'" Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)). In the instant case, however, a crucial issue was not undeveloped; rather, it was resolved unfavorably to plaintiff. See e.g. Samons v. Astrue, 497 F.3d 813, 819 (8th Cir. 2007) (finding ALJ need not have contacted claimant's treating physician after finding that physician's opinion was inadequate

- 27 -

to establish disability).

The ALJ conducted an extensive review of the medical record, which included multiple consultative psychological examinations, and found that the evidence did not support plaintiff's allegations of disability.  The ALJ properly rejected the opinion of psychiatrist Dr. Manikant that plaintiff was disabled because it conflicted with his own findings and the remainder of the record. The ALJ found that plaintiff was capable of a limited range of light, simple work, involving only occasional interaction with supervisors, co-workers, and the public.  This determination is supported by substantial evidence on the record as a whole, including the opinion of consultative psychologist Dr. Mades, treating psychiatrist Dr. Santos, medical expert Dr. Arvenshine, and plaintiff's own testimony regarding her daily activities and limitations.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment.  Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this 11th  day of September, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE